v. Eisen, and we're going to wait until everybody shuffles out of the room and you get settled in the front. We're going to wait until everybody shuffles out of the room and you get settled in the Okay, are we okay on both sides? Okay, Mr. Brisson. Good morning. Matthew Brisson from Mr. Chartier. So the securities fraud case against Mr. Chartier proceeded on sort of two parallel theories of liability. The first being that the stock promoters that he hired went out there and lied to the investing public when they failed to disclose the fact that they were being paid to promote these stocks. And this was sort of your classical material misrepresentation slash emission theory of liability. But the problem from the government standpoint is that there was virtually no evidence that Mr. Chartier was aware of these misrepresentations. The promoters were contractually obligated to disclose the fact that they were getting paid. There were forward-facing statements on their website that Mr. Chartier would have seen actually made the required disclosures, and there was no testimony from any witness, whether it be Ms. Lee, his partner, or Mr. Max, who ran the stock promoter, that anyone ever told Chartier that he suspected, that he knew, that these people were not making the requisite disclosures on the calls to investors. And so in the absence of that evidence, the government really leaned into this alternative theory of liability, and that is the matched trading theory of liability. The idea here being that each and every time Mr. Chartier received a tip from the stock promoter that, hey, we have this incoming buy order— But on the first point, you're saying there's no evidence he knew that they were making misrepresentations, but there was evidence that he knew the nature of the operation which would involve misrepresentations, right? So a jury could decide that—a reasonable jury could decide that he knew that there were representations being made. I thought your argument was more precise, that because he didn't control the specific statement that was being made, he can't be liable. There's, I think, two separate problems that I'm making. I'm happy to address sort of the Janice aspect of the argument first, but I think there are distinct issues. You're saying, so first, that there's just no evidence that he knew there were misrepresentations, but, you know, I'm curious about this other argument that he might have known there were misrepresentations, but they weren't his statements. So I should be clear. I'm not arguing pure legal insufficiency, right? He did the testimony that there was a brief visit to this boiler room, so that's sort of the most telling evidence that he could have potentially understood what was going on there. So potentially a jury could infer circumstantially, maybe he could have understood or knew. What I'm saying is the evidence that he actually knew was weak, and this goes more to prejudice than it does to legal sufficiency, is my point. But you're telling me the instruction. I'm talking about the effect of the instruction and the prejudice in particular. So before we get to prejudice, we have to conclude that the instruction on one or both prongs of the alternative theories was error. Absolutely, absolutely. And what I was saying is if there were overwhelming evidence here that he knew these material misrepresentations were being made, and this was a black and white material misrepresentation case, then maybe these other issues wouldn't matter so much. But they do matter here because the evidence was weak. What about the instruction of aiding and abetting? Let's assume you're right. He didn't control the statements. He didn't make the statements. But what about the theory of aiding and abetting? So again, you're not challenging the instructions on aiding and abetting, are you? I'm not. I'm not. And as we acknowledged in our brief, there was a legitimate path here. When we talk about the Janus end of the instructional era, right, there was a legitimate path for the government to argue that he was guilty as an aider and abetter. That's a tool that the government has that's not available in civil cases. And so we acknowledge that. That was a potential path towards conviction. But that's not what the government argued here. They didn't make this argument to the jury. The only time the government, if you look at the summation, that they referenced aiding and abetting liability at all is in connection with the money laundering. The government's argument in summation is that the law is irrelevant. But why is it relevant for the harmless error analysis? So if you think that the jury instruction was erroneous in saying that the government just needs to show that he knew that the statements were being made, and maybe that's an error because of the Janus idea because he didn't control the statements or make it himself. And so the jury could have found just by hiring a boiler room, he was making the statements he made, but he, like, didn't control the actual statements. So you might say that that's not consistent with Janus. But that would be aiding and abetting, right? If you provide funds and you enlist the boiler room to go and do the bump and dump scheme, and the jury's instructed that he needs to know that there are false statements being made. So if he hires a group to go make false statements, he has aided and abetted their superior fraud. And so the idea is that the jury had been properly instructed, maybe it was convicted under aiding and abetting, but that would make the error harmless because the punishment would be the same. So in order to establish aiding and abetting liability, causation certainly isn't enough, right? It's not enough to show that he caused the false statements to be made. It would have to be that he caused them to be made, that he knew that they were being made. Right, but that is part of the instruction, that he knew about the statements, right? If it is sufficient, the government establishes that the defendant knowingly and intentionally caused the statement to be made or the fact to be admitted with the intent to deprive. That was included in the instructions. You're correct, Your Honor. It's not aiding and abetting. I mean, you're not using the word aiding and abetting, but isn't that exactly what the instruction is? Again, and I think we tried to acknowledge this in the brief, that there was a potential path here for the government to argue there was aiding and abetting liability. That is not what they argued. What they argued is that he was primarily liable, and that's clearly incorrect under Janus. I do want to – No, I get it, but I'm just saying that we do a harmless error analysis, right? You don't dispute that. I understand that's an analysis that this Court must engage in. But I do want to focus – you know, I tried to start on this separate issue, and I hope it's clear that it's a separate and distinct issue, and that is a match-trigger, right? Because the Janus issue focuses on the first problem that I referenced, the first theory of liability, the material omission, right? And for the reasons that I stated, I actually think it's unlikely that the jury convicted him under that theory, aiding and abetting or otherwise, because the evidence of his actual knowledge of the false statements was so thin. What the government ended up doing at this trial is leaning heavily on this alternative theory of liability, which was each and every time Mr. Chartier receives a tip about an incoming buy order and he sells into that demand, that is a match-trigger. And the government argued this is per se a fraudulent conduct, this is per se illegal, right? And it provided this jury with this – Well, it would be per se a fraudulent conduct under Section 9A1, right? But he wasn't charged with violating Section 9A1. He was charged with violating Section 10B and Rule 10B-5. Well, the government presented it as potential scheme liability, right? Under Rule 10B-A and C, they said mass trading is a form of manipulation, and therefore you don't even have to look at material emissions necessarily. Just by selling his stock into this demand, these are fraudulent transactions. And the problem is these are not matched trades. Matched trading is a term of art under the Securities Law, right? It connotes what is essentially a sham transaction, a transaction that is not intended to convey stock from person A to person B. Yeah, it's interesting. A matched trade is normally a sham transaction that's designed to create the illusion of trading where there's no change in beneficial ownership. But what's interesting about Section 9A1 is it doesn't seem to make a change in beneficial ownership or requirements for something to be a matched trade. It says, for the purpose of creating a false or misleading appearance of active trading or insecurity, then it's a violation, A, to affect any transaction in such security which involves no change in the beneficial ownership thereof. And then it says, or, B, so it's disjunctive, or to enter an order or orders for the purpose of such security with the knowledge that an order or orders of substantially the same size and substantially the same time and substantially the same price for the sale of such security has been or will be entered by or for the same price. So it doesn't seem like the statute envisions, even though the classical definition of a matched trade is there's no change in beneficial ownership because it's all a sham and the buyer is coordinating with the seller, the statute seems to define it as including a circumstance where maybe the buyer is a bona fide buyer and there's a change in beneficial ownership, but the person who enters the order for the purchase knows that there's a seller on the opposite end who's buying it for the same price at the same time. And that describes what's going on here, right? So I think the statute distinguishes two concepts. One is when you talk about really no change in beneficial ownership, that is, I think, what we traditionally call a wash trade, right? I sell from one account that I control to another. A matched trade gets a little bit more complex because I think you're using essentially a nominee in that case, right? It's an account that my cousin or my buddy controls as opposed to me. So there is technically a change in ownership, but that's not the purpose. I think the purpose of this idea that the preamble of that section that I just read would be for the purpose of creating a false or misleading appearance of active trading in the security. Now, I agree that a purpose of the trading here was for the seller just to make a profit on the individual trade because he wants to sell it to the buyer who was, you know, misled into making the purchase. But isn't it also a purpose of this scheme that they want to inflate the price of the security over time so they'll make more money out of the trades? So why wouldn't it be right to say that here the conduct was for the purpose of creating a false or misleading appearance of active trading? I do want to take one step back because I think John just said something very important, and that is what distinguishes these types of transactions and what makes them illegal is the purpose and the intent of the parties, right? And you're absolutely right. That is what was missing here because there was no evidence that Charlier was effectuating these transactions. What do you mean it's missing? I mean, they all talk about it as a pump and dump scheme. The whole idea of that is to raise the price of the security over time. It's not just to make money off of individual transactions. It's to pump up the value of the stock, right, to inflate the price. You can't say there's no evidence that the scheme was designed to pump up the value of the stock. The problem with this colloquial term, pump and dump, is it's a conclusory term, right? And the government falls back on this again and again. We don't need to worry about it. This is a classical pump and dump. It's manipulation. But how is it manipulative, right? What is the mechanism? Because the Supreme Court is very clear, manipulation is a term of art. And I think this is ultimately what's happening here. The government is saying, these brokers got on the throne and they lied to a bunch of folks. And these people went out and bought. And because they bought, the stock price went up, even though it's manipulation. The government is conflating two completely distinct concepts. It very well may be the case that if I engage with material misrepresentation to the investing public, it may have the effect of increasing demand, which thereby increases the stock price. But that is not manipulation. I feel like we're jumping back and forth between arguments that feel like sufficiency arguments and arguments that feel like what I thought you were focusing on, which is a challenge to the jury instruction. Am I confused as to which road we're on right now? No, and I hope not. I apologize if I confuse you. No, I think we're all doing it. But are we talking about the jury instruction? We are talking about the jury instruction. I think maybe I should be clear, because I'm trying to signal two separate areas of the jury instruction. Right, and we've talked about the material misrepresentation. The jury instruction, whether we cause material misrepresentation. Right, and if either of them is wrong, then I have a Yates problem. If neither of them is wrong, there's no Yates problem. And if they're both wrong, then we don't even have to talk about Yates. So I get that. And now we're talking about the scheme or device. And so I understand your argument that the instruction seems to suggest that the mere fact of selling into a known buyer in what was called, whether it was really accurate in terms of the way this term is used as a term of art, is what the court was calling a match trade, is a problem. And I understand your argument to be, well, no. That in itself is not a problem. But I'm looking at the court's instruction, and it doesn't simply say, if you find a match trade in the way that we've just described it, you can convict. It says you have to find, it describes a bunch of practices, and it says they have to be intended to mislead investors by artificially affecting market activity. Now, you may jump into the sufficiency world and start arguing, I don't think it was briefed that way, but arguing about whether there was sufficient evidence to show that that's what they were doing. But as far as a challenge to the jury instruction, doesn't that portion of the judge's instruction meet your objection that match trades alone aren't enough to convict? So, the portion of the jury charge that we challenged here, and this came up during the charge conference, and the government asked basically to have this charge specially crafted to fit this theory, right? And it was that match trades involve related persons or parties, and they said, who control both sides of the transactions. Right. And the court did then go on to provide that the jury had to make these additional findings that it artificially affected market activity. Part of the problem, I think, if it were the court's instructions standing on its own, I mean, I acknowledge, in a different case, these instructions might not ultimately be that problematic if they were not wedded in the way that they were to the abrasive arguments that the prosecutors made here. And the arguments that they were making were A, every time you see this order coming in, you sell into it, that's a match trade. And B, it affected the market because these people were duped. Again, the government is leaning back on, it's conflating these two separate theories of liability, right? But why can't they do it at the same time? So, if it's a transaction in which somebody, the person who's entering the order, the person in the boiler room, misleads somebody into making a purchase for an inflated price, and then he enters the order for the purchase knowing that there's a seller who's going to buy at that inflated price, he is duping the person into making, into a fraudulent transaction where he knows that there's a matched buyer. And he's also doing it for the purpose of increasing the price of the security over time. Like, why are those mutually exclusive? Why can't that just be true that that's what they were doing? I mean, this focuses, I think, on the intent of the person in the boiler room. And, of course, our argument focuses on what did Mr. Chartier know when he found out... Well, if it's all a conspiracy, then, you know, that's an objective of it, right? Well... I mean, and also there would be an inference that if he knows about the activities of the boiler room, which, you know, you can argue about sufficiency, but if he knows what they're up to generally, one thing they're up to is inflating the price of the securities they're promoting. And this is where I, and I'm not trying to lean into a sufficiency argument, I'm just trying to be a key player, right? So, like, he is going to make more money on the future trade if the price of the security is increased overall. I suppose that's true. I don't think there was particular evidence. So, for instance, I don't recall seeing evidence that, for instance, the traders were using this technique to, let's say, walk off the price, right? What the testimony was, actually, was they wouldn't place a market order, right? Because that market order would get lost in the noise. They would go slightly below the market order and place a limit order so that you could identify that order when it hit the level two, right? So, I mean, I... So, but now you're saying that the evidence showed, at most, they wanted to make money off of the individual transactions, and despite their reference to it as a pump-and-dump scheme, they weren't really pumping. They were only dumping because they had no interest in inflating the price of the security. That's your position? No, my argument is that the liability, in this case, to the extent that there was liability, arose from the fact that there was a failure to disclose a conflict of interest while these promoters were out there aggressively pumping the stock. And it's conceivable that Mr. Chardet could be liable for that conduct if he knew they were failing to make the requisite disclosures. But that was the burden the government was able to allay by lying... So, it really comes down to the sufficiency of the evidence, right? It's not really about the instruction. But it is about the instruction. It's about the instruction and the argument that the government was making that these were matched trades. I wouldn't argue that the evidence was legally insufficient to ever convict him under a theory that he could have... Some jury somewhere could have found that he implicitly knew that there were lies being made. What I'm saying is the jury lied and it's burdened to prove that by instead throwing out this legally incorrect and infirm theory of liability under matched trades. I understand your critique of the government's argument, right? But what you've challenged on appeal is the court's instruction. And I understand the critique of the government's argument is it seems to suggest that even putting aside the misleading conduct to pump up the stock, the mere fact of matching the sale to the purchase order is itself nefarious and supports liability and that's not the case. But you're not arguing sufficiency. You're arguing that the instruction allowed the jury to convict without meeting the requirements of the statute. And I still want to understand from you why it's not adequate for the court to meet your concern for the court to have specifically identified matched trades among other practices and qualified it by that are intended to mislead investors by artificially affecting market activity. Why doesn't that answer your concern that the jury's not being required to decide what it needs to decide? So I think that language is distinct from what the jury should have been required to find in order to find matched trades which is, as Judge Massey alluded to earlier, a purpose to create a false or misleading appearance of active trading. But he's not in charge for matched trades, right? Matched trade isn't an element of the charge here. It's one of the means by which the manipulative fraud on the market can take place in manipulative and deceptive acts. So understanding that that's the charge isn't intended to mislead investors by artificially affecting market activity. Doesn't that match up with the elements of the statutory cause of action? Again, I think in a plain vanilla case this instruction might not be so problematic. It was the instruction taken together with the argument which created the problem. And in particular, I think the government looked to satisfy that flaw, the artificially affecting market activity, by citing the fact exactly like they do in their briefs to say these investors were duped, right? That's not manipulation. That's material misrepresentation. And as this court has made clear... Yeah, but again, why can't it be both? So the classical matched trade is the buyer is colluding with the seller. They coordinate with each other. But if I am a broker or somebody working at the boiler room and instead of putting up my own money to make the purchase, I like convince a senior citizen to purchase the thing knowing that there is a matched seller who I am coordinating with, that looks a lot like a matched trade. And so first, why is that a deceptive device that would be a violation of 10b-5? And two, it does seem to even meet the definition of what a matched trade is under Section 9A-1 because it's done for the purpose of pumping up the value of the stock and you're entering the orders knowing that there's a matched buyer, right? So what I'd say is this court has made an effort to keep manipulation in one lane, material misrepresentation in another lane, conceptually, in rental, in FCC, VU, RIA, Tinto. And what we're doing, I think, when we start having this conversation is we're conflating these two separate concepts. We're not really conflating them. It's just that if you're doing this and you're a key player, it seems like there was evidence that he wanted to do both things, which is make money off of the individual transaction but also inflate the value of the stock. My position is that it is not possible to be both a participant in a matched trade and a victim in a matched trade, right? Because the very concept of a matched trade is that it is, in some sense, an illusory transaction undertaken by both parties for the purpose... But how is he a victim? Well, under your scenario, and really the scenario the government posited, you submitted that couldn't you have a matched trade where there's a person who's buying it. They might be buying it in good faith, but they're being recommended to buy it based on bad information. Isn't that still a matched trade if the purpose of the stock promoter, right, is to inflate the price? Am I... Yeah, that's reasonable, okay. Why is that not possible? Respectfully, no. I don't think that is a matched trade because I think a matched trade hinges on the intent of the buyer and seller, right? Whether or not it's an illusory transaction that is merely meant to deceive the market, to inject false information. Right, but then I go back to the definition under Section 9A, which seems to say that a change in beneficial ownership is not an essential feature of a matched trade. Okay. But even if you have a change in beneficial ownership, it can still be a matched trade if you do it as a matched buyer. But I think you have to... Sorry, seller. As you said, the definition of the statute focuses on the intent of the parties, but I think you have to focus on the intent of the buyer and seller. I don't think you can focus on the intent of, in this case... Well, actually, it's pretty clear about this intent because the person who enters the order or orders for the purchase or the person who enters the order for the sale, right, isn't that actually the stock promoter here? They're acting as the broker? The buyer himself didn't enter the order knowing that there was a matched buyer, but the broker did. So the broker's actually going to place the orders in this case. Look, the promoters were merely making recommendations. The buyers would go onto their own accounts and they would place these orders themselves. Okay. So the only parties to this transaction were Mr. Sherman... But then actually, doesn't that make it worse? It also says that it's a violation to enter any order orders for the sale of the security with the knowledge that an order of substantially the same size for the purchase is happening at the same time. So if Mr. Chartier is entering the order for the sale of his security and he knows that the boiler room has set up a purchaser at substantially the same price, then it violates 9A1 subsection C. But it's not a misleading appearance of active trading. It is active trading, right? These are bona fide transactions. Now, it may very well be that these transactions are ill-advised, that they were made because... No, they're fraudulently induced, right? And that may be the case, right? But that's a separate theory of liability. It's not a misleading appearance of active trading, but it's actually... So now you're acknowledging that Mr. Chartier entered an order for the sale of his security with the knowledge that there was a corresponding purchase at the same time, right? At least a reasonable jury could conclude that, right? The government's evidence and their argument... The only question is whether he's doing that for the purpose of creating a false or misleading appearance of active trading in the security. And it's true, one of his purposes is he wants to profit off the individual transaction. But he has hired a promoter of the security to pump up the value of the price. And he has an interest in doing so because he's gonna make more sales in the future. So why can't a reasonable jury look at this case and say he is entering that order for the sale for the purpose of creating a misleading appearance of active trading? I guess my argument, and maybe this will not satisfy Your Honor, is that this is not a misleading appearance of active trading because it's a trade. It's a real and honestly bona fide transaction. Regardless of whether it's entered into based on bad information, this is not a bogus transaction. Okay, fine, I have that argument. But just one quick follow-up and then I'll surrender the floor. So, but he's also not charged with the violation of Section 9A. So does that matter? So I'm arguing about maybe this meets the definition of Section 9A. And so if they're instructed on what a matched, if the jury's instructed on what a matched trade is, but it's not a completely precise definition, but the conduct that the jury's instructed to find in order to find the violation of 10b-5 still describes a deceptive practice or a scheme to defraud, wouldn't that be okay at the most harmless error? I mean, so the jury or the judge expressly framed, to the extent that there was scheme liability here, she expressly framed it in terms of matched trading. And I think from my perspective, it would be an odd result if matched trading meant one thing under Rule 10b-5 and something entirely different than is defined by Congress in Section 10. No, but I'm saying that even if I grant that she's using the term matched trading imprecisely, using it more generally than it really should be, but she's talking about there being a matched party without saying it's a kind of sham transaction, maybe that's an error in a way because it's the wrong terminology, but the findings that the jury's instructed to find still state a violation of 10b-5. Wouldn't that be at the most harmless? I guess I would disagree, Your Honor. I know, but I wanted to know why. So my concern here is, again, this got away from what should have been the heart and center of this case, and that is whether or not Charlier was aware of the fact that there were material misrepresentations. And I think this theory was a shortcut to conviction that allowed the government to elide that burden. But one of the questions I wanted to just clear, review of this issue of jury instruction as far as your client is under plain error. Your client, counsel submitted a red line instruction, and then Eisen's counsel raised some issues during the charge conference. There was a discussion about how matched trades would be defined because of the fact that the alleged victims here were part of that trade. The court agreed with the government's assessment that it didn't make sense the way the matched instructions was defined to the jury, proposed language after listening to both sides, albeit Eisen's counsel only, and then Eisen's counsel said, that's a correct statement of the law, Judge. So that's a better question for your co-counsel or Eisen's counsel about waiver. But as far as your client is concerned, there was no voicing, no objection, no saying to the court, well, wait a minute. You know, Mr. Eisen's counsel may be satisfied, but we're not. And if it's so centered to your argument, why not say something to the court? It feels like invited error when the court relies on one of two of the attorneys present making a representation to the court, that's a correct statement of the law, only to now on appeal say, that's a complete incorrect statement of the law. So our position has been, Your Honor, and again, I want to sort of try to untangle the threads here if I could, that the Janus argument is certainly subject to plain error. Now, there's been a suggestion here from the government that the Janus error is actually invited error. I acknowledge that it's plain error. I would push back strongly on the notion. As to your client, that may be a different situation as to Mr. Eisen. Well, again, I'm focusing on the Janus argument. I will say, I believe the record was that the parties joined in each other's objections to the charge. I know counsel for Eisen was more active during the charge conference in general, and I think Mr. Sade's counsel was relying on him to some extent. So you would agree that if Eisen's counsel objected that's represented to the court, that it was a correct statement of the law, your client would adopt that? No, Your Honor. Okay. I thought that's what I heard you say. I'm going to take a step back from that. My position was that as far as the match trade argument goes, now, could this have been a better developed argument? Yes. I wish it was. Every time I see somebody in this record say match trades, I want to pull my hair out. But there was a colloquy during the charge conference, and there was a point where Eisen's counsel said, these are match trades you have to show that related parties played both sides of the trade. And the government said, no, no, no. That's not correct. And the court quickly agreed and basically endorsed the government's theory of match trading. And at that point, I think the parties sort of backpedaled and didn't continue to press the issue. I wish they had pressed it. But my position is the issue was raised and adequately preserved. At most, it's plain error. But I would argue that the match trade issue, unlike the Janus issue, is subject to denominal review. Okay. Thank you very much, Mr. Brissenden. You've reserved time for rebuttal. But let's hear from the other appellant, Ms. Schoenfeld. Good morning, Your Honor. Gwen Schoenfeld on behalf of Lawrence Eisen. I want to start with the conspiracy charge in this case. There was a variance because despite the charge and the indictment, there was insufficient evidence to show that Mr. Eisen, in August of 2014, which was phase one of hydrocarbons, early stages of phase one, that he joined a pump and dump conspiracy with Chartier and Lee. And remember, phase one of hydrocarbons was when the government stated in its indictment, and this is consistent with the evidence, that Eisen was not manipulating the market. In fact, was not manipulating the market for an entire year. But that is when they say you joined a conspiracy to manipulate the market. If we conclude that there's sufficient evidence that he joined the conspiracy later, but nevertheless joined the conspiracy, how does that help you? OK. So I don't think you can conclude he joined the conspiracy later. He may have arguably joined a smaller conspiracy. But let me explain why he could not have joined it with Chartier and Lee later on. So key to the government, they didn't just This is a real conspiracy. They can't just show that each spoke is conspiring with the hub. You have to connect the spokes. There has to be interdependence among the spokes. They have to be working together. They have to know that they are part of a larger team. Isn't the case law that the spokes are working with the hub? They have to know an awareness of each other and that they're working for the same goal, albeit different companies, the pump and dump scheme. But they just can't be working against each other for it to be a single conspiracy. And I'm just going to ask you if you can move the mic a little closer to you. Thank you. Sorry. So I get your argument on this variance. Your position is it's more than one conspiracy. It's two conspiracies. So that's the real question. And isn't our case law that they don't have to be working as long as the prongs know are working with the same person, in this case, Mass and the boiler room, on a general pump and dump scheme, and they're aware of each other's existence. You don't dispute that there's evidence that they were aware of each other's existence. Two answers to that. Eisen did know Chartier was working with Mass. Eisen did not know Chartier was involved in a manipulation scheme at that time. At what time? When he supposedly joined this pump and dump conspiracy. I'm sure you could conclude that, right? I mean, there's evidence that he knew what the place was up to. He knew about the existence of Chartier. He also proposed the invoice system where it's concealed that it's a per-trade payment as opposed to an hourly payment. And they spoke to each other, right? There were conference calls between all of them. But you need to really, really focus on the date. If you mush everything together and make it to use... Yeah, but that goes to Robinson's question about how does it help you if he joined the conspiracy later. And your answer to that was, well, there's evidence that he even joined the conspiracy later. So is there another reason why it would matter if he joined the conspiracy later? Yeah. Chartier, in terms of Eisen, is out of the picture in December of 2014. The evidence that you just pointed to, the false invoices, is much later, has nothing to do with Chartier. And in determining what the agreement was... But the invoices covered Chartier's stuff, the ticker symbols, right? No. The invoice, I don't believe, had anything to do with Chartier. So is your legal position that... I think this is what I was getting at, is in a conspiracy, normally, you can be accountable for things that preceded you or came after you. You're not only liable for the snapshot during your own involvement, to the extent that you sort of know you're joining a broader conspiracy. And so if the theory of the case, from your perspective, is what Eisen was doing with the folks at the boiler room during the period when he was interacting with Chartier was not unlawful, but then he later engaged in unlawful stuff after Chartier had ceased his own activities with the boiler room. If we conclude that a jury could conclude that Eisen knew full well about Chartier's existence and the conduct that he was engaged in, does it make it a variance or a separate conspiracy for him to engage in unlawful conduct later? Does there have to be a synchronicity, chronologically, between the conduct or do they just have to know about each other? They have to know about each other and that they were both doing something in that conspiracy. Just using that doesn't create a conspiracy. So let's say... And the reason why, because normally in a hub-and-spoke conspiracy, the hub is kind of the nerve center that's directing the whole thing, whereas here your position would be like, well, they both independently hired the boiler room, so the boiler room is kind of like a service provider. So it's not really a classic hub-and-spoke conspiracy because they're not joining some central conspiracy. They're all using somebody to provide services for them. If they cannot prove it, yes, it would just be a bunch of individual spokes, which is what I'm arguing. But the real problem is all of your questions are assuming that at some point Eisen realized what Chartier was doing, that Eisen realized Chartier was involved in a pump-and-dump and therefore knew that there were other spokes doing the same thing, and hey, maybe they were working together for... In the government's windows, we have evidence that Eisen provided advice to Max on using the HECC consulting agreements to cover over the CESX scheme. Max consulted with Eisen on materials that recensed Max about CESX. Eisen provided CESX training data to Max to assist with Chartier's CESX scheme. So unless you're telling me that this is all incorrect, isn't there evidence that actually Eisen was advising Max about how to further the scheme involving Chartier? But there's one thing missing from Max's testimony, and Max was only too happy to throw Larry Eisen under the bus. Max doesn't say... Well, okay, but the jury can still make an inference, right? Yeah, but Max said there's no evidence that there was a discussion at that point with Eisen saying, hey, I'm involved in a pump-and-dump. Tell me how you use these three documents or reports or whatever to further your scheme. There's no evidence that Eisen knew at that point. And one of the important things... Yeah, but isn't there evidence that your client knows about trading and visited the boiler room and the inference is that he knows what's going on there, right? I understand you're saying maybe that's not sufficient, but a reasonable jury could conclude that, couldn't it? But this is what happens. When everything starts getting mixed up in this and you're not looking individually what Eisen knew at which times and what he could infer later on, it all looks like a big conspiracy. But when you parse this out, which took me weeks, but that was argued to the jury. You did not object to the instructions that the court gave on single versus multiple conspiracies, correct? That's correct. So assuming the jury was properly instructed and these arguments were made before the jury that this is not a single conspiracy and the jury thought otherwise based on the evidence that has been just discussed, that Judge Menasci pointed out, why is it that, why should we say the jury got it wrong? Are you just asking us to make a different conclusion? Why should we disturb the jury verdict when they heard all of these arguments and there was no objection to the instruction and they were asked to make that determination of a single versus multiple conspiracy? Okay, so what this becomes at the variance stage is effectively an insufficient evidence claim. But for the insufficient evidence involving a conspiracy and a variance, you also need prejudice to get a reversal, but not a remix. But in this case, even a variance would result in a remix. But the variance that you were describing, I thought the variance was the government charged a single conspiracy but proceeded on a double conspiracy theory, sort of a different theory. And the trial court said no, the government's theory of the case has been consistent throughout. And now, earlier, you were suggesting that there are multiple conspiracies because of the timing of when Eisen joined the conspiracy vis-a-vis Chartier and when Chartier left or the conspiracy ended as to Chartier. So I'm trying to understand what the variance is. Is it changing now at oral argument? So, no, I'm not changing. So the variance is the indictment charged big, overarching, pump-and-dump conspiracy. I am saying Eisen did not have the knowledge of what Chartier was doing to join that pump-and-dump conspiracy. The government said, here's the spoke. The spoke is Chartier. That is their link. That is their pull to get Eisen into this general scheme but there is no evidence before, during, or after that Eisen ever knew what Chartier was doing. Isn't there evidence? I know there was some evidence that there were 42 contacts, I mean, or phone contacts between them that math suggested Chartier ought to hire Eisen for marketing purposes. So there was some evidence of that. But is the law that it wasn't there enough evidence for the jury to infer that Eisen, having been previously barred from the industry for allegedly similar conduct, understood that when he was contracting with math, who was similarly barred, that he was doing so for the purpose of a pump-and-dump scheme, and that Chartier, who was part of that, already using the boiler room, was doing it for the same purpose? I mean, couldn't the jury infer, I understand a different argument was made by the defense before them, but couldn't the jury infer that both of these individuals were using the boiler room and math services for the same purpose? Just like in a drug conspiracy, right? Somebody may be buying heroin and somebody else may be buying cocaine from the same drug dealer. They may be both spokes in that drug conspiracy, they may be buying different things. Chartier has his companies and Eisen has his, but the goal is the same, right? To pump and dump the stock and transfer their own shares of stock so they can inflate the price and make a profit off of it. Yes, but the difference with the drug conspiracy in this case is, for one year, Eisen didn't go in there looking for a pump-and-dump conspiracy. He did not manipulate the stock and I can go through the evidence to show... But the point is, do you agree with the premise that if two drug dealers are using the same supplier to supply their own drug operation, that they would be involved in a conspiracy together? But here's the difference then. You have two drug dealers. Maybe he has a prior conviction, but one's buying aspirin, the other one's buying cocaine. At some point, he decides... Okay, so your argument depends on Eisen's conduct being innocent, not on Eisen not coordinating with Chartier. It is based on what Eisen intended to agree to with Chartier at the time. Which is hypothetical. So if there are two drug dealers and one is buying cocaine and one heroin from the same supplier, you're saying they would be involved in a conspiracy together, but if one is buying aspirin and the other one is buying heroin, they're not. So it's not really because the two drug dealers are not coordinating. It's because you're saying one of them is engaging in innocent conduct and doesn't know what's going on. And at that point in time, he was. But the example of the heroin versus cocaine, there are certainly plenty of cases where the courts have found that they can be two separate conspiracies. If they don't know about each other and if they're working against... if they're at odds with the goal, right? Even if they know about each other, but just knowledge is not sufficient. So even if they're aware of the others, they can have two different tracks and the courts have found that in different drug cases, that there have been two separate conspiracies, especially when you might have some overlap but not a lot of overlap. They're all very fact specific. But you can have a common supplier and a heroin... Which is why I was suggesting earlier that it's important that there's evidence that Eisen and Chargier knew about each other and that they were coordinating together in some sense. Or that they were enmeshed in some way. It's just because Eisen had another conviction and Mass did too. They're not barred from promotion. Even their experts said, Orland said, Eisen wasn't barred from doing stock promotion. Then why do a consulting contract under an alias if you're not barred from promotion? Eisen didn't... If you're talking about Keith Miller signing the agreement, that's a practical thing. Practical? Or did Mass say to Eisen, I can't use my name because I'm barred? Yeah, he doesn't want to attract attention. So he's in the industry. It makes sense. You have other people you're working with. It doesn't necessarily mean he's engaging in another crime just because he did it before. Look, I'm not going to draw attention to myself. I do have a business. It's a valid business. They were looking to hire a stock promotion company. I'm going to have my associates sign the documents in corporations all over the place. You have different people signing the documents. And it may be that some corporations do. You know, if you commit a crime, you get a second chance, you go out there, and you don't want to draw attention. So you are going to have a front person. Draw attention, but not customers. No, you don't want to draw attention to the SEC. That's the attention they're not trying to draw, right? Well, it could be customers. I mean, the truth of the matter is... Well, but Mass, allegedly, right, he said, I told them my name can't be used because I'm barred. My name can't be used because I do have a bar, but not because I am banned from doing, you know, some form of a stock promotion. But the real key thing for this conspiracy is, yes, Eisen had a prior conviction. It doesn't mean he was out there to do the same thing. And if you look at why things changed, then that is another key development. Why did it go from legal to not legal? Now, if you look at that, it's because of the route in the oil market, which tanks a whole bunch of companies, not just Hydrocarb, and that continued. And when they started running out of money during Phase 2, approaching Phase 2, which is a year later, that is when the scheme changed. That is when it arguably became a separate conspiracy. It didn't change because of some preconceived notion of an agreement that they had a year earlier. That would involve some level of clairvoyancy on Eisen's part that clearly he didn't possess. It changed not because they agreed to join a pump and dump. It changed because the things that happened in the market made very poor decisions. The legal theory, and let's set aside sort of arguing the facts for a second, would be that if Eisen was engaging in legitimate activity with Madsen Company, and I'm going to ask you to assume for a minute that a jury could infer that he was aware that Chartier was engaged in unlawful activity using those same resources and may have had some engagement with Chartier related to that. And then subsequently, he also engages with Madsen in similar conduct. Your position is, as a matter of law, because those didn't overlap temporally, they can't be the same conspiracy, regardless of the knowledge that Eisen had when he entered into it. No, because of one key assumption.  You assumed that he knew what Chartier was doing. I understand that. And I understand that your argument is not about timing. It's about what Eisen knew or didn't know. The timing is a red herring. The timing is a red herring to the extent that you just have to look at when people knew certain things. When did they know it? When did they do it? It's not that you're hypo. I agree with you with that assumption that that would be a conspiracy. But Eisen didn't know that Chartier was doing it. The government has six pieces of evidence that they used to link Chartier and Eisen. And one of them, Judge Minasci went through the first three, which shows, yes, he was aware of CESX. OK, so Madsen is doing business with them. But the other one was there were discussions in October of 2014. That's when you had the conference call or meeting, whatever it was at the time, where Lee and Chartier were there. And it was to discuss whether to hire Joe G. Mangebot, who owned Levelogic, or Eisen. And if you look at that time, that actually doesn't help the government's case, because the government conceded at trial that Levelogic was a legitimate promotional company. So they were not disgusted. It is not a fair or reasonable inference that they were discussing some pump-and-dump scheme with a legitimate promoter that they then went and hired. So Eisen is taking part in a meeting and a discussion where a legitimate marketing was being discussed. Levelogic was never charged. OK, I understand that argument. Can I ask about the loss calculation? Oh, yeah. So I have two general questions. One is, you say that this issue only arises if we think there isn't a unitary conspiracy. But it's not obvious why you say that, because it seems like the way it's calculated might be an error under either a unitary conspiracy or separate ones. Is it because you just don't benefit from a recalculation if there's a unitary conspiracy, because the whole loss could be attributed to each individual client? Is that why it doesn't matter? Yes, no. OK, so it's not just that it wouldn't be an error. It's just that it would be harmless if there's a unitary conspiracy. And whatever. I mean, you're just saying we don't rely on it unless we find that there are separate conspiracies. I don't know that it would be harmless necessarily. If this court wanted a remand just for re-sentencing on the two stocks, a limited remand, whether or not there's a conspiracy, it would be OK. I don't want to open the door to a separate argument. OK, and then the loss calculation, the district court takes the period in which the stock was inflated. And it multiplies it by all of the outstanding stocks at the time. It seems to me you can make two objections to that. And one you don't. One you make about market conditions. The other one is, you know, ICID and Chartier don't own all the outstanding stocks of each company, right? There's other trading that's going on. So maybe the district court should have discounted the number of stocks by what they didn't intend to sell as part of their scheme. But you don't suggest that that was an error. Is that also because it wouldn't make a difference to the outcome? No, no. So one, the market conditions, yes, I do. One thing I want to correct, Items wasn't selling his stock during the manipulation time. And the government conceded that he was not. All right, but anyway, it's not just his own. It's also like if he has an interest in inflating the stock, he's causing harm to people who are harmed by the fraudulent inflation of the stock. But he's only causing harm to people who bought the stock before the misrepresentation, or I guess during the misrepresentation when it's inflated and sold it after the drop. So there is some class of stockholders that bought it before the misrepresentation and sold it after the revelation of the misrepresentation and so wouldn't be harmed. But you don't suggest that the measure of all outstanding shares was erroneous. You just say that the district court's error was not to take into account market conditions, right? I'm wondering why that happened. If they're proceeding on an actual loss, which is what all the parties thought they were proceeding at at the sentencing, you can multiply it by the total amount of shares. But you're supposed to reduce it by external market forces. The other issue that you're raising, where you only do it, two things, the other thing is they did raise at sentencing an issue that not all of the shares were in the public float. That issue too, that it has to be tradable. It's part of even their intended loss if it's not tradable, right? Yes, the court initially said, yeah, OK, I agree with that, it should be just the public float and reduce it. It reduced it by millions, but it didn't get it to the lower level in the guideline. But the difference between actual and intended loss, does that mean that if the intended loss is an acceptable measure, it can be all the number of outstanding shares? No, no. And that was the other point I wanted to get into. With the intended loss, the cases where they have used the gain, which is what the government did here, they don't multiply it by all of this, the float, or all the shares outstanding. They only multiply it by the number of shares controlled by the defendant, which in this case is exponentially lower. But that's if you're trying to measure the gain. I mean, the government tells us the district court was trying to measure the loss. And it's true, normally you would measure the intended loss, the harm to others by the drop in the stock price once the misrepresentation is revealed. But it's not obvious that if the district court takes the narrow period in which the misrepresentation was going on and looks at the change in the stock during that period, that could be a measure of how much the stock was artificially inflated, and therefore the loss to the people who would have sold it after the misrepresentation and it was revealed. If I understand correctly, so just taking the gain and not considering the market price. The run-up of the price. Yes. So normally what you would do is the misrepresentation is there. Then there's a disclosure of the misrepresentation. And at the disclosure, you can look at how much the stock drops to see what the effect of the misrepresentation was. And that's a measure of it. But if you're looking at a very narrow time period, they should really correspond to each other, right? If it's a very quick run-up, it's going to correspond to a drop when the misrepresentation is revealed. Yeah, but the problem here is the entire run-up was not even accepting the government's theory that they were manipulating the price. And I pointed out why they were not doing that at that time. There's no evidence that they were actually manipulating the price. Yeah, I'm interested in the way the calculation works upon all that evidence. Can I just ask a follow-up on that? Are you sure you want a remand for resentencing? Because I think a co-defendant, Mr. Watts, appealed and there was a remand. And his sentence went from one year and a day to 60 months. Your client is looking. His guideline recommendation was 20 years. The court reduced that substantially to 60 months. So regardless of what calculation you use, whether it's actual loss to the victims or some other calculation, do you really want the court to resentence him, assuming you're not successful on your legal issues, on a different loss calculation? I'm just curious if that's really the position you want to take, given that the court went from a guideline calculation in the 20-year range and sentenced him to 60 months. There's a big difference between Watts and Eisen. Yeah, but the government appealed his sentence. No, the government cross-appealed. Mr. Watts appealed, the government cross-appealed. And he had received a year and a day. The government cross-appealed. This court said a 95% reduction in sentence was not reasonable. And then he received 60 months. My question for you is simply, you said you would welcome a remand for a different sentence, and I'm just wondering, assuming your client's not successful on the merits of the appeal itself, are you really asking us to remand for resentencing on a loss calculation that may be not necessarily beneficial to your client? I'm just wondering if that's really your position. Okay, so I might be misunderstanding something, but the government, in Eisen's case, has not appealed the five-year sentence at all. So remanding only on the loss calculation should not be resulting in a higher sentence. You're just wanting a different restitution amount. The loss calculation. The loss and the restitution are connected. Right. But the loss affects the actual sentence, right? The loss affects the actual sentence. But that's why I am only appealing the loss calculation if there is no single conspiracy. Because if there is no single conspiracy, we are still limited to the same two stops, not four stops. Okay. So if we're limited to the same two stops, the only way the court's going on the calculation is down. Got it. Okay, so if we think that there was one conspiracy, you don't want us to get into that, because on remand you're at risk of the court saying, well, now that the Second Circuit has concluded this is a unitary conspiracy, we can pull in all the intended loss from others as well, and you're facing more... You don't want us to get into that. Yeah, because that possibility is there. But by the way, it's not to say there wouldn't be an argument that those other stops should still not be included in the loss calculation. And the government did not include them in this calculation out of the goodness of their heart. They realized that there could be an issue because you're only liable for the losses that were reasonably foreseeable to you. And the evidence on the conspiracy was thin. I think the government... Well, they might not agree with that. ...about the loss calculation. So you talked about whether they should have excluded the stops that wouldn't have been affected. But then there's also the question of market conditions. So you make this point that the price of hydrocarb was affected by the price of crude oil, right? But the district court looked at just the period between the week of November 23, 2015, right? And we can look up the price of crude oil during that period. It doesn't seem to have changed during that week. So any fluctuation in crude oil that occurred before it, wouldn't that already be baked in? And so actually just focusing on that week, we know about the increase that's attributable to the misrepresentations, as opposed to crude oil fluctuations, right? So, but what were the misrepresentations during that one-week period? Because you have an 8K report that came out on the day of that period. The 8K said that they just secured financing. You have a company that is trying... It's a legitimate company. Nobody questioned that. You have a company that is... But it's not the crude oil, but it's the 8K... ...release during that period that you think the district court should have discounted. The 8K was released. That drove the price up. It was not false statements that drove the price up. And the government tries to say, well, there was a lot of matched trading, so the volume was controlled by the ISIN at that point. But that's not what happened. They showed matched trading, watched trading during that period. It was 1 in 3% of the market. That is hardly a manipulation scheme. They were not manipulating. I guess my other question about why, you know, make the argument that the district court's error was not discounting the number of shares. The district court just multiplied the inflation by all outstanding shares, and maybe that would not even be part of the intended loss because it only controls a small fraction of the shares. That is an error, but that error alone would not have reduced the guidelines. But is that a compounded error? Yes, absolutely. And if there were a remand, there would be a bunch of factors. I have another question about the Alexa rankings. So the fraud was revealed after the period the district court considers, which is February to June of 2016. But I assume since that happened, it means that the fraud was going on during the period. But do we know when it started? Like, I guess I couldn't really... So then it could be that it was early enough. It wouldn't have affected whatever inflation occurred between February and June of 2016, right? Yeah, I don't know... You'd have to show that it arose during that period to show that it affected the rise in the stock price, wouldn't you? Yes, and I don't think there was evidence as to a lot of detail in terms of...  When it arose. It definitely didn't come out until the end. That's when the company tanked. But that was after, like you said, that was after the period that the government used. The government just used the first day of trading. They looked at the chart and they went to the highest point it ever reached. And they're like, oh, here's our number. Same way they did it in HydroCard. If you look at the chart in HydroCard, and this is IA 1841, it's going down the entire time. There is only one spike because during a really bad time they got funding. And by the way, there is no evidence that that funding was false, that it was not true. So that is not in this representation in the market. The government did the same thing. They just wanted to find a spike because it needed to fit into the pump and dump conspiracy. And that is not the conspiracy that Eisen joined. This is hardly a picture of a pump and dump scheme. He didn't go there looking for it. And that is why he couldn't have joined with Chartier. And there was no evidence. Once Chartier left the scheme, there's no more connection with him. And that's December of 2014. After that, the government does not introduce evidence connecting any other folk. It's just Eisen on his own. He made these decisions with Watts and Mass about... Okay, I think we have that argument. It was your time for rebuttal, so we'll hear from you again. But let's turn to the government. Ms. Farrell. Ms. Farrell. May it please the court, my name is Caitlin Farrell. I'm an assistant United States attorney in the Eastern District of New York. And along with my colleague, Whitman Knapp, I represented the government in the trial below. So as proven beyond a reasonable doubt at trial, Chartier and Eisen both participated in a years-long conspiracy with two successive Long Island boiler rooms to defraud hundreds of retail investors, many of whom were elderly and retired, of their life savings. The co-conspirators used nearly every fraudulent technique that you could imagine to get people to buy the garbage stock that the boiler room was promoting. This included lying to investors about their own credentials and the credentials of the stock, manipulative trading, which included match-and-wash trading, using phony consultant agreements to illegally unrestrict restricted shares so that they could be sold to victims, using nominees to possess and sell unrestricted shares, and using fake invoices and agreements to hide the true nature of their payments to the boiler room. So can I go back to this issue we were talking about before? Let's assume that the instruction invited the jury or allowed the jury to convict on the basis of the determination that there were match trades. And let's assume that the definition of match trades that the jury understood would apply there would be match trades that involved an unknowing seller selling into a buyer who was matching. Sorry, unknowing buyer. Bad thinking. Buyer-seller slip. Why is that, why would that be unlawful in the absence of the other pieces of, other fraudulent manipulative conduct? Because the seller, who in this case was either Eisen or Chartier or one of their co-conspirators, knew that on the other side of the transaction there was a purchaser for a particular volume, a particular time, and a particular price. So at any time, let's pretend that there was never any pumping. Or there was legitimate stock promotion, right? And the sellers bought into a known, or they matched, rather than just going to the market sort of generally. They matched a particular buyer for whatever reason. That would be a violation of, and we're not talking about the statute that involves magistrates in particular, that would be a violation of the 10-day requirements here. Unless I'm misunderstanding something, if someone is simply making a sale and it's matched in the market by a legitimate buyer, that is not illegal. The problem is the seller's knowledge that there is a buyer on the other side, and specifically the size of the buy, the price of the buy, and the timing of the buy. Just help me understand why that knowledge, again, there's no pumping, there's no misrepresentations. Why is that fraudulent? Help me understand why that's fraudulent. Because it creates the appearance of supply and demand and of free market activity when in fact it's not. It's not hypothetical, it is, right? There's a willing buyer who is willing to pay a certain amount for a stock, and there's a seller who is like, yeah, I'll take that. I want to take advantage of that offer to buy. Why is that? Why does the knowledge that there's a specific buyer out there make it fraudulent? Because he knows his offer for sale is going to be accepted. He goes into that transaction knowing that there's someone waiting on the other side to accept that sale, as opposed to just putting it out in the market and hoping that someone will buy it. And that activity affects the price of the stock. Whether there are willing buyers on the other side makes the stock price go up. But if whether there's a willing buyer on the other side is driven by entirely legitimate market considerations, why would that be distorting? Well, again, the important thing here is that they know precisely the amount, precisely the time, and precisely the price that the person is willing to purchase it for. Because that affects stock volume, and it affects stock price. And so it's not simply just that there are willing sellers in the market, but it's the knowledge that this particular price and this particular volume will be purchased at this time when I offer it into sale. So you're saying it's a planned match as opposed to a happenstance match that could occur in the market, that might occur in the market where there's a buyer and a seller that don't know each other are either selling at a particular time or what price, or buying at a particular time and what price. And it just so happens they happen to match. So you're saying it's a planned match. That's exactly right. If the promoter doesn't know, or if the promoter gets a call from somebody who says, I would like to buy this stock at this price, so the promoter has not caused the purchase, but if the promoter knows a possible buyer and says, I heard there's somebody who wants to buy it at this price right now, you should offer your stock for sale, that would still be fraudulent, even in the absence of the fraudulent existence? That would be a closer case. I think it would depend specifically on the fact of that, of what exactly the people are saying in that discussion. Right, so you're saying that in this case you actually have the purpose to create the misrepresentation of activity and trading because the purchase is fraudulently induced. That's right, Your Honor. And Your Honor focused a lot on Section 9, and I appreciated that because I was going to draw your attention to it if you didn't raise it yourself. But it's important to note, so, sorry, just to take a step back. So Section 9 is a provision of the Securities Law that specifically deals with manipulative trading. We charge the broader conspiracy of scheme or artificial defraud, but the courts commonly look to the more specific provisions of the Securities Act to define specific actions, which is what Section 9 is doing here. And so, Chardier's Lawyer really focuses on the first provision of Section 9A1, which is the preamble of for the purpose of creating a false or misleading appearance of active trading, but ignores the second part of the preamble, which is for a false or misleading appearance with respect to the market for any such security. Now, we don't agree that the conduct here is excluded from that first portion of the preamble. I think as we proved at trial and as we discussed in our brief, there were different goals throughout the course of the conspiracy of what the co-conspirators were trying to do with the duped investors, including creating an appearance of active trading. But basically throughout, they are attempting to create a false or misleading appearance with respect to the market for any... And when you say they, you mean these defendants, not the promoter. These defendants and the promoter working in concert. Well, I mean, as we were talking about, Section 9A does focus on the person who enters the order for the purchase or the sale, right? The promoter doesn't actually enter the order, right? That's correct. But, so we would focus specifically here on subsection C, talking about Chartier and Eisen, who both... They enter the order. Correct, exactly. And they did it for the purpose of creating a false or misleading appearance with respect to the market because they know that the price is inflated. Exactly. But if they didn't actually know that the promoter was inflating the price, then it would not be for that purpose, right? So, like, it does depend on them knowing what the promoter is doing and how the promoter is inducing the purchase. And here there's overwhelming evidence that they knew exactly what was going on. No, but going to the... This goes to the instruction, right? And that's what I'm struggling with as well, is if they're not doing it because they know that the subsection A problem exists, the misrepresentation to manipulate the price of the stock, then why is the fact of the match itself the problem? If the boiler room... I'm sorry, this is a little bit of a long answer to your question, but I want to sort of pose a hypothetical in response. If the boiler room was being completely honest with their customers, but was still feeding this information about we have 12 customers, we're going to tell them to put in buy orders for this amount at this price, that is still market manipulation. Now, in this case, we have both the upfront lies and the manipulation on the back end, but you don't actually need the upfront lies in order to have market manipulation on the basis of match trading, so long as the information is being conveyed by the boiler room to the sellers of exactly the price, volume, and timing of the sales. Because as Eric Mack testified about throughout the trial, part of what they were attempting to do was control the price of the stock by using all of these boiler room victims and timing out their purchase in order to walk the price up. That was one technique. Again, they have a whole grab bag of fraudulent techniques that they're using and that they employ depending on what the specific goals of the scheme are in that moment. As both lawyers discussed, there were a variety of goals that happened throughout the course of the scheme. At some point, it was, let's just get the price up and keep it level. Let's get volume up. Sometimes it would help me dump my shares. The fact that there were different goals and different ways in which they manipulated the market compounds the problem. It doesn't mean that all of these different things looked at in slices is not illegal. If no one has any more questions on the mass trading, I think I'll move to the issue of the multiple conspiracies charge. I'm happy to be guided by Your Honor. If we're at a transition, I would love to ask you about the loss calculation on the pricing because one of the things I was struggling with is you have this one week period. There's an announcement. The market burns information that is not fraudulently conveyed to the market. It's truthful information about the potential for other financing. That drives up the price. That gain is calculated in the intended loss as the basis for the intended loss. I understand your position to be, yeah, they timed their promotional pumping to correspond to that announcement and, therefore, it's legitimately included. I'm trying to figure out why that follows and if that's accurate information that's properly conveyed to the market, why can't that be, why shouldn't that be washed out from the gain that's attributable to the misrepresentation or the scheme? So, first of all, just in quick answer, that's why we used an inflationary analysis as opposed to a deflationary analysis, meaning when you're looking at the deflation of a stock, it really is important to strip from that calculation external market forces or other things that might be causing the drop. But when you're looking at it from the, just to take a step back, what is the purpose of the loss calculation in the guidelines? It's to serve as a proxy for the harm that the defendant has caused and enables the court to find an appropriate guidelines calculation that really captures their harm to the community. And so when we, the reason we looked at it from an inflationary perspective, there are a few reasons. One is because we had evidence from not only our cooperator, Eric Ness, but also from the trading data that this is a period of time where the boiler room was acting at a fever pitch. It was choosing, deliberately choosing, to engage in manipulative trading specifically to be in concert with this SEC filing coming out because they thought they could get the stock price higher that way. And so it really captures... I think I understood Robertson's question was, yeah, they timed it when something came out that would, for a valid market reason, inflate the price. So it's not part of the fraud, right? Well, it is because they time their manipulative trading and their PR blitz around the coming, the outcoming news so that they can get the price up as high as possible. So if they didn't control when the 8K came out, that's what we're talking about, right? The 8K? That's correct. If they didn't know when the thing came out, so let's say they see that there's a rise in, or there's a beneficial change in the crude oil price, and they just, oh, let's jump on that and let's start doing their fraudulent scheme. Now that that has happened, we can take advantage of that higher price and bump the stock. You're saying that the fluctuation in the price of crude oil would be part of the fraud? In an inflationary analysis, yes, because the whole point is that they're jumping on, they're jumping on the real market conditions, adding their, you know, their spice of the fraud in order to maximize the harm, or rather the return that they're getting from raising the stock price. Do you have to try to pull out what would have happened in a market without that manipulative conduct? You would in a deflationary analysis. What's the rationale for this one-way ratchet here? Because the whole point of the pump and dump scheme is to get, and this goes into the issue of it being intended loss versus actual loss. The reason, and the guidelines tell you you're supposed to use the higher of the two. And again, it's to capture the harm caused by the defendant's conduct. But you're saying that in the deflationary analysis, you should exclude market conditions. So if something bad happens, something's going to drop in the price, you should exclude that. Correct. Because it's not part of the scheme. But things happen in the market that lead to an increase in the price too. So if you're measuring the intended loss by the increase in the price, why wouldn't you exclude market conditions for that? I don't think you would in every case. In any event, in this case, there is substantial evidence that they were capitalizing upon the release of this news in order to inflate the price as much as possible. And I want to address... Is there a case where, you know, they perpetrated a fraud and they timed the revelation of the fraud because they knew it was going to happen sooner or later. They timed it around something that was going to crash the stock anyway. Then that event would be part of the fraud too because they timed it? Well, if you were doing a deflationary analysis, you would end up with a lower loss number because you would have to exclude... You know, you would have the negative news of the fraud coming out and the positive news of whatever else. Is there a case that sort of describes this distinction that you're telling us about the distinction between how you do the inflationary versus the deflationary or something we can look to besides your... I understand your explanation. I'm just wondering where it comes from. Sure. Well, it's really rooted in the guidelines. The cases are sort of all over the place, frankly. Most of the cases cited in the brief or many of them deal with private civil suits, stock draft lawsuits, and those are just fundamentally different than a case here where we have substantial evidence of precisely what the co-conspirators intended and why they timed their activities the way they did. And so, you know, we try to be thoughtful about loss analysis when I say we, I mean the government. And we're, we, you know, are making efforts and I think the court, district court made substantial efforts to really tie the loss analysis around what happened in this case, what are the facts of this case. Sorry, I thought you were going to ask a question,  And so, what we did and what the court did was take sworn testimony and records and looked at where is the greatest impact of the boiler rooms activities so that we can measure the intended loss here based on what's actually happening in the case.  but you've taken a period where you're combining the impact of the boiler rooms activities with an independent market feature and I guess I'm just trying to figure out when you say, again, I understand but there's a difference in what you do and you don't wash out those things in the inflationary analysis when they've timed it to take advantage of that. Where are the guidelines as we look for that? You said there aren't cases or the cases are all over. Is there something that you can point me to in the guidelines to sort of make that distinction? Between using and washing out the co-occurring market actions. So it's sort of a combination of the guidelines and case law. The case law really talks about the necessity of excluding confounding factors when you're doing a deflationary analysis and then the guidelines say you can either use an inflationary or a deflationary analysis and then gives an example of how you would calculate deflation and to answer a question Your Honor, Judge Manasci was raising earlier the guidelines are where the idea of using the number of shares outstanding comes from and this is Although that's in the deflationary, right?  After the drop right? I understand that the guidelines say that, which is why maybe it's not an error if you're just following what the guidelines say.  say, I guess this is comment N, right? To be whatever. It says you can take the drop and then multiply the difference in average price by the number of shares outstanding. Is that saying that? I guess my question is, is that reasonable? Sometimes they don't control the number of shares outstanding. Do they really intend to cause a loss of all the shares outstanding if they only control a limited set of them? Or if there are some shares that obviously wouldn't be affected by the fraud like restricted shares or shares of stockholders that just sit on their shares for long periods of time and so would not would not be among those people who purchased after the fraud but sold after the revelation. So does it seem unreasonable to sort of measure the intended loss by just saying it's all the shares that are outstanding? I would have hesitation employing that technique in a case where we're talking about a blue chip stock that's widely traded on the NASDAQ or the New York Stock Exchange. In a case like this where we're talking about very thinly traded penny stocks where essentially the entire market is the co-conspirators and then... There was evidence in the record that the market was not the co-conspirators, right? There was the expert who testified that for HECC that Watts was responsible for 23.58% of the stocks traded, right? So he's not essentially all of the stocks. Correct. So Watts is only one of several co-conspirators and as one example I think Eisen points to what's referred to as the reflection chart and that Watts on these particular days that we used to calculate the inflation Watts himself wasn't actually trading that much but you know who was? Eric Mast in the nominee accounts that he used to wash the stock and to make the stock price go up. You're saying that if we looked at all of the trading and put together all of the defendants they would be responsible for almost all of the trading and that's why it's okay to multiply the inflation by the number of outstanding shares? That is certainly true with the ESX and NWMH and and ISIF with HECC there were people who owned of all of all these companies HECC was the most legitimate and there were people many of whom were Watts's family members who owned shares of HECC prior to the boiler room activity so it's a closer call on HECC than others but all of these were in big picture they all were thinly traded they were all traded on the pink sheet they were not traded on a major stock exchange so the ability of their price to be manipulated by the co-conspirators was substantially more which is why frankly this is an art not a science there's no precise way to measure loss in these cases but in an attempt to get the most  calculations for the purposes of the guidelines not restitution which is a separate issue and was  separately but to give the court a workable number for the guidelines we chose and the court adopted the methodology of using all shares outstanding and I would just point out while we're on this topic there was a little bit of  about how we weren't doing something out of the  of our heart so just to deal with that issue the government chose only to  loss for the specific stock tickers that each individual defendant was responsible for for the purposes of calculating the guidelines and not all of the stock tickers that were charged in the overarching conspiracy the reason being the loss there the total loss to the boiler and we also want to be realistic and make requests of the court that aren't going to get laughed out of court so we made the decision to only advocate for a loss amount based on the stock tickers that these defendants were personally responsible for it wasn't because we thought our legal theory was problematic our overarching conspiracy legal theory was problematic it was because I don't know but if you think that actually it would be unreasonable to attribute to them the loss of the whole conspiracy doesn't that suggest that you don't really think that they were full participants in the whole conspiracy we don't think it's unreasonable we just wanted to come in with a principled request for a realistic sentence for a non-violent crime there are many other issues raised in this case I'm happy to take your honors questions but I'm not inclined to continue speaking unless you have specific questions about any issues what about the Janus question so if the jury instruction says you could have caused the statement to be made didn't that invite the jury to say just by hiring the boiler room and knowing that they would make false statements you caused it to be made and so therefore violated the securities laws but Janus tells us you have to be in control of the boiler room   main theory of our case was that Mr. Chardier caused the boiler room to make misrepresentation that was never argued it was not presented at trial and that's not our theory our theory is that these co-conspirators engaged in a scheme to defraud by doing a variety of fraudulent things hiring the boiler room knowing that they were going to be lying to investors agreeing to matching trades using false invoices freeing up shares illegally that is the scheme to defraud and so this idea that our theory was premised on either causing the boiler room to make misstatements just not at all tethered to the reality of this case but let's say it was so why did the district court instruct the jury on that question she really didn't that's the thing so as we said in our brief context is important so there's the phrase in connection with and that is really the place where the challenge instruction comes up as Chartier's attorney pointed out in the reply brief he did not originally challenge this but that statement also the issue of being caused to be raised also comes up in the prior instruction about false statement and omission but at no point is the court saying you can find Mr. Chartier guilty if you found he caused the boiler room to make these omissions that was not even the theory that they're instructed on it's just explain to the jury what it means to be doing something in connection with the security that is correct your honor but let's just say in a hypothetical world this a was our theory of liability and b that is what you know the court did make instruction that you could find Mr. Chartier criminally liable if he caused the boiler room to make misstatements. We would still be fine because we charged liability on the charges. We didn't argue it because it wasn't our theory at all but we would be fine because under the criminal law and under section 2 unlike in the civil context and unlike in the private context you can be held accountable for causing something to  criminally as an accessory. I don't have much more to say about that. If you have any questions I'm happy to answer. Thank you very much Ms. Farrell. We will turn back to Mr. Brisson on rebuttal. I thought the government's response was interesting because I think it lays bare a fundamental disagreement we have as to what constitutes a match trade. At the end of the day the government said all you need to show is the price amount of time. If you have that knowledge go ahead and execute a trade. I fundamentally disagreed with that premise. First of all, and there was even testimony in this case, oftentimes people in  security industry have level two machines. They sit in front of these machines as they are called all day and they see the amount of orders being posted for, the time, the price, and they can choose to hit that amount     invested in this great company. I think they have great potential. Down the road I need to free up some money.  told my neighbor I'm going to be selling my shares next Tuesday. If you want to jump in and see if you can get a hold of them, do it if you want. That's a bona fide transaction. That's not a transaction undertaken for the purpose of creating false appearance of market activity. That's not a crime. Mere foreknowledge does not create a matched trade. I think that's the fundamental disagreement that we have. What the government articulated today is a theory they articulated in front of the jury. I think it was wrong. That's what troubles me so deeply. Okay. Thank you very much. Thank you, Mr. Brissenden. We'll hear now from Ms. Schoenfeld. Thank you. I want to provide a couple of answers to Jeff Robinson's question about asking for a case that discusses the distinction between inflationary matters and deflationary matters.  isn't one. They do not draw a distinction. The same market factors still affect it going up or down. There are external market factors that are going to affect the price of the stock whether it's going up or down. And those three cases that I cited, the cases that are cited in the briefs and argued most about, those are all criminal cases. They're not civil. The only civil case I cited was the Supreme Court's case of pharmaceuticals. And what they did, which was a second circuit case, they said that it should have been,  that the  loss should apply equally in a criminal case where somebody's jail time and freedom are at stake. So they do apply equally in both. And there is no distinction between inflationary and deflationary in terms of the need to take out external market forces. Although I suppose in the civil context, we're actually, we don't have this context of intended loss. We're actually citing people for the actual loss whereas in the criminal we have the guideline construct of intended loss that's different. Yes. So, continuing on that theme, the government, their market capitalization theory, that Judge Manasi said is mentioned in the guidelines under 2B1.1 which is application note 3F9, that is not intended loss theory. That is an actual loss theory and that's what the guidelines say. The government is trying to slap another name on it and call it intended loss because they don't want to take out the external market forces. So now they are changing their whole theory in terms of what their loss is. But the guidelines say you can have an actual loss theory that is just the effect of the fraud and then multiplied by all the outstanding shares. It would definitely be allowed in intended loss theory, right? But you still have, even in my brief, all of those cases are intended loss but it still considers external market factors, things other that were not attributed to the defendant's loss, whether it's collateral or how much money the client was trying to get or the net amount that the client was trying to get from investors. Intended loss still incorporates what did the defendant intend. The difference is intended loss is subjective. What did the defendant subjectively intend to do? Not what risk did he expose his clients to. What did he intend? So in this case, the problem with the intended loss, and this is probably why the government didn't argue intended loss at the sentencing hearing, there wasn't any. It was a legitimate company. Everyone thought if it could ride out the route in the oil market, everyone was going to make money. Nobody was intending to take money and make people lose money. They thought it was a  company, and their theory of intended loss doesn't apply in that case, and that's why they didn't use it. It would have been zero for HEC, and HEC is the company that is really driving Eisen's guidelines, the loss and the restitution. ICE is much smaller. It's not much of a difference whether how you calculate the loss, whether it's intended or actual. It's HEC, and HEC is legitimate. And that is why the government is trying to call it intended. We don't have to take out anything. We can just say he intended to fraud the whole market. Thank you very much. Ms. Schoenfeld, the case is submitted. That is our last case this morning. We are adjourned. Thank you.